# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

Nos. 07-1256/07-1258

_____

Trustees of the Graphic     *
Communications International     *
Union Upper Midwest Local 1M     *
Health and Welfare Plan,     *     Appeal from the United States
    *     District Court for the
    Appellants/Cross-     *     District of Minnesota.
    Appellees,     *
    *
    v.     *     [PUBLISHED]
    *
Olaf Bjorkedal; Tamara Bjorkedal,     *
    *
    Appellees/Cross-     *
    Appellants.     *

_____

Submitted: November 15, 2007
Filed: February 22, 2008

_____

Before MURPHY, HANSEN, and GRUENDER, Circuit Judges.

_____

HANSEN, Circuit Judge.

The Trustees of the Graphic Communications International Union Upper Midwest Local 1M Health and Welfare Plan (Trustees) brought an action against Olaf and Tamara Bjorkedal, shareholders of Nordic Printing and Packaging, Inc., under the Employee Retirement Income Security Act (ERISA) after Nordic Printing and

Packaging stopped making payments to the Graphic Communications International Union Upper Midwest Local 1M Health and Welfare Fund. The Trustees sought relief based on breach of contract, breach of fiduciary duty, and piercing the corporate veil theories of liability. The Trustees now appeal the district court's[1] grant of summary judgment in favor of the Bjorkedals, and the Bjorkedals cross-appeal the district court's denial of their motion for attorney's fees. We affirm.

I.

Olaf Bjorkedal and Harry Jacobson incorporated Nordic Press, Inc. in 1968, which they operated as a printing shop. They also incorporated two other printing-related businesses, Nordic Packaging, Inc. and Nordic Pak, Inc., as well as a fourth business, Nordic Leasing, Inc., which was not involved in the printing business but which leased cars and specialized equipment. Bjorkedal and Jacobson both served as officers and directors of each corporation, and each owned 50% of the stock of Nordic Press and Nordic Packaging. Nordic Pak and Nordic Leasing were owned 40% by Bjorkedal, 40% by Jacobson, and 20% by Alvin Vander Plaats, who served as the general manager and eventually became the financial controller and secretary of the various corporations. Bjorkedal and Jacobson each gifted part of their stock to family members, but all of the Nordic Press and Nordic Packaging stock, and 80% of the Nordic Pak and Nordic Leasing stock, remained within the two families.

In the early 1970s, Olaf and Tamara Bjorkedal and Harry Jacobson and his wife, acting as individuals, together built a warehouse at 5017 Boone Avenue North, New Hope, Minnesota, which they leased to the Nordic companies. The Bjorkedals and Jacobsons also owned as individuals a building at 8501 54th Avenue North in New Hope, and the two families leased space in it to Nordic Packaging and Nordic

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

Pak. The buildings were treated as rental properties on the Bjorkedals' and Jacobsons' personal income tax returns. No written agreement controlled the rental activities, but the rental activities were operated as a general partnership.

Jacobson died in 1993, and his share of the corporations was placed in a trust for his family. Vander Plaats retired in 1997 and was replaced by Dave McKay. Business declined substantially following Vander Plaats' retirement, and the Nordic companies faced serious financial trouble. Bjorkedal stopped taking a salary from any of the entities in September 2001 and made numerous cash infusions of his own money during that time. McKay was replaced by Dee Dee Foster as chief financial officer (CFO) in December 2001. In 2002, Bjorkedal acquired 100% of the stock of Nordic Press, Nordic Packaging, and Nordic Pak and consolidated them into a company called Nordic Printing and Packaging, Inc. (P&P). Nordic Leasing ceased operations in 2002. At that time, Bjorkedal also acquired 100% ownership in the Boone Avenue Warehouse, and the 54th Avenue Warehouse was sold and the proceeds paid to the Jacobson family trust. Bjorkedal continued to advance his own money to P&P, contributing $350,000 in June 2003 and pledging his personally owned real estate in an attempt to keep the company afloat. P&P filed for bankruptcy protection in September 2003 and was ultimately sold to Marcom, a company owned 40% by Foster.

Prior to its consolidation with P&P, Nordic Press had employed union labor. Pursuant to a series of Collective Bargaining Agreements (CBAs), Nordic Press participated in the Graphic Communications International Union Upper Midwest Local 1-M Health and Welfare Fund (the Fund), which provided health and medical benefits to the union employees. The CBAs required Nordic Press to pay for sixty months of health coverage for employees following their retirement. In 1988, the Fund and Nordic Press entered into an Adoption Agreement Contract (Agreement), which amended the then-current CBA. The Agreement incorporated the Rules and Regulations of the Trustees, attached as an exhibit to the Agreement. The Rules and

Regulations obligated employers who withdrew from the Fund to pay a lump-sum withdrawal contribution to the Fund to cover the sixty months of retiree health coverage.

P&P, as Nordic Press's successor, had continued to employ union labor and took over Nordic Press's obligations under the CBAs and the Agreement. Faced with financial trouble, P&P stopped making contributions for health benefits to the Fund in March 2003, resulting in a delinquency owed for health benefit premiums of $75,005. It also failed to remit payments withheld from employees' wages for the employees' portion of the health benefit premiums totaling $6,440. The Fund's Trustees notified P&P of its contractual withdrawal liability, estimating the liability needed to cover the sixty months' worth of retiree health benefits at approximately $260,000. The Trustees brought an adversarial proceeding within the bankruptcy proceeding against P&P, Bjorkedal, and Foster for *statutory* withdrawal liability related to P&P's *pension* obligations. The pension liability dispute was settled with the Marcom sale. P&P's contractual liability for health and welfare benefits, however, was not litigated within the bankruptcy proceeding.

Following P&P's bankruptcy, the Trustees brought suit against the Bjorkedals personally, claiming that they were liable for P&P's corporate obligations to the health and welfare plan under breach of contract, breach of fiduciary duty, and alter ego/piercing the corporate veil theories of liability. The district court granted summary judgment to the Bjorkedals, finding that P&P was a valid, separate entity, and that the Bjorkedals were not personally liable for P&P's obligations under any of the asserted theories. The district court denied the Bjorkedals' claim for attorney's fees, finding that the Trustees had acted properly in asserting the claims. Both parties appeal.

## II.

We review the district court's order granting summary judgment *de novo*. LaSalle v. Mercantile Bancorporation, Inc. Long Term Disability Plan, 498 F.3d 805, 808 (8th Cir. 2007). The Trustees characterize their action as involving two types of payments: contractual obligations based on the premiums owed but not paid to the Fund, and withdrawal liability, which arose when P&P withdrew from the Fund and became obligated to cover the cost of health benefit premiums for retirees for a period of five years. This is something of a mischaracterization. The withdrawal liability at issue is wholly contractual in nature. Although ERISA imposes *statutory* withdrawal liability on employers who withdraw from *pension* plans, see 29 U.S.C. § 1381; see also Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 790 (8th Cir. 2002) (explaining that pension plans have required vesting requirements while welfare plans do not), the Fund at issue here is a *welfare* plan, not a *pension* plan, and the § 1381 statutory withdrawal liability does not apply to P&P's withdrawal from the Fund, see Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund, 967 F.2d 688, 694 n.8 (1st Cir. 1992) (noting that § 1381 applies to pension funds, not welfare funds). Thus, P&P faced withdrawal liability only because it agreed to it in the Agreement. Both types of claims involved in this case–the delinquent premiums and the withdrawal liability–are really only contractual claims.

### A. ERISA § 515 liability

The Trustees style their complaint as an ERISA § 515 action, which requires that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan . . . shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan." 29 U.S.C. § 1145. While P&P was certainly an employer obligated to make contributions to a multiemployer plan, this action is against the Bjorkedals personally. The Trustees try to reach the Bjorkedals personally by defining "employer" within § 1145 by

reference to 29 U.S.C. § 1301, which treats trades or businesses under common control as a single employer. See 29 U.S.C. § 1301(b)(1). The Trustees link the two statutory provisions by asserting that the Bjorkedals jointly owned a separate entity that owned the building leased to P&P, that that separate entity was under common control with P&P because both were owned by Olaf Bjorkedal and managed by Vander Plaats, and that Olaf and Tamara Bjorkedal, who operated the rental activity as a partnership at the time of the delinquency in the welfare payments, are therefore the employers of P&P's employees.

The first problem with the Trustees' argument is that § 1301 applies only to subchapter III of ERISA, see § 1301(b)(1) ("For purposes of this subchapter, . . . all employees of trades or business (whether or not incorporated) which are under common control shall be treated as employed by a single employer"), and that subchapter explicitly applies only to *pension* plans, see 29 U.S.C. § 1321(a) (limiting coverage of "this subchapter" to pension plans or similar plans under the Internal Revenue Code). As we have already pointed out, the Fund at issue is a welfare plan, which is separate and distinct from a pension plan for ERISA purposes. Thus, the broad definition of employer contained in § 1301(b)(1) does not impose statutory liability on commonly controlled entities for liabilities based on delinquent contributions to a multiemployer welfare plan under § 1145.

The Trustees recognize that the § 1301 definition of employer does not apply directly to § 1145 liability, but argue that it applies in this case because the Agreement explicitly incorporated the definition. The Agreement incorporates the Rules and Regulations of the Fund, which provide that "the term 'employer' shall be as defined in ERISA section 4001(b)(1) [29 U.S.C. § 1301(b)(1)]. In cases of common control, all trades or businesses which are under common control as defined in [I.R.C.] Section 414(c) will be considered as a single employer." (Appellees' Add. at 5.) The Trustees focus much of their argument on whether the rental partnership is a business under common control with Nordic Press within the meaning of § 1301(b)(1). But Vander

-6-

Plaats signed the Agreement in his capacity as "V.P. Secretary" of Nordic Press, Inc. (Appellees' Add. at 1), not on behalf of the rental partnership. Just as a corporation acts through its officers, a partnership acts through its partners. See Minn. Stat. § 323A.0301(1) ("An act of a partner . . . for apparently carrying on in the ordinary course the partnership business . . . binds the partnership."). Vander Plaats was not a partner in the rental operation and did not sign the Agreement expressly on its behalf. While Nordic Press is free to obligate itself to whatever contractual provisions it chooses, one entity cannot obligate another entity, even a related entity, without the second entity's consent. To the extent an individual signs an agreement purporting to bind related entities, the person so signing must first have authority to act for those separate and distinct entities. Thus, we need not decide whether there is evidence to establish that the rental partnership is a trade or business under common control with Nordic Press unless the evidence first creates a material question of fact regarding whether Vander Plaats (or through him Nordic Press) had the authority to bind any other entities under common control. In other words, to prevail in their argument that the Bjorkedals are personally liable as "employers" under the Agreement, the Trustees must first establish that Vander Plaats bound the rental partnership when he signed the Agreement that included controlled entities in its definition of employer.

This court applies general "corporate law principles to determine employer liability under ERISA, where such principles comport with the language and purposes of the statute." Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors, Inc., 104 F.3d 1050, 1055 (8th Cir. 1997); see also Minn. Laborers Health & Welfare Fund v. Scanlan, 360 F.3d 925, 927-28 (8th Cir. 2004) ("In Employee Retirement Income Security Act (ERISA) § 515 cases, we apply the corporate law standard to determine alter ego status because it 'strikes an appropriate balance between the congressional intent of ERISA and the long-established principle that a corporation's existence is presumed to be separate and may be disregarded only under narrowly prescribed circumstances.'" (internal marks omitted)). "In general, only a party to a collective bargaining agreement is bound by its terms . . . ." Crest

Tankers, Inc. v. Nat'l Mar. Union of Am., 796 F.2d 234, 237 (8th Cir. 1986). Thus, the Trustees can reach the rental partnership (and through it potentially the Bjorkedals personally) only if an exception to that general rule applies. See Superior Gen. Contractors, 104 F.3d at 1055-56 (applying the corporate law standard of alter ego rather than the labor law alter ego doctrine to an ERISA § 515 claim seeking to hold one corporation liable for another corporation's fringe benefit contributions to a welfare fund). The Trustees tacitly agree that they must use general corporate doctrines to bind the rental partnership to the Agreement, which was signed only on behalf of Nordic Press. (See Appellants' Br. at 35.) The Trustees assert that the rental partnership is liable as a controlled entity with Nordic Press based on the doctrines of agency, alter ego, joint venture, and ratification.

## 1. Agency

An agent can bind a principal through actual authority, either express or implied, and through apparent authority. Actual authority is that authority given by the principal to the agent to act on its behalf, and it requires that the principal manifest its consent to the agent's ability to bind the principal. See Restatement (Third) of Agency § 3.01 (2006). Actual "authority must be traced to the principal's dealings with the agent; it cannot be inferred from the agent's dealings with third parties." Tullis v. Federated Mut. Ins. Co., 570 N.W.2d 309, 313 (Minn. 1997).

The Trustees have presented no evidence that either Bjorkedal or Jacobson, on behalf of the rental partnership, manifested an intent that Vander Plaats bind the partnership to contracts, let alone that they assented to Vander Plaats binding the partnership to this particular Agreement. While Vander Plaats was able to receive rental deposits and direct funds to be paid from the partnership's checking account, he was not authorized to sign checks on the partnership checking account. Nor did he sign contracts on behalf of the partnership; Bjorkedal and Jacobson personally signed the lease agreements as owners of the leased buildings. The only business of the

partnership was leasing buildings. The partnership had no employees, and binding it to a CBA as an employer cannot be construed as acting in the rental partnership's ordinary course of business. There is no evidence that Vander Plaats himself thought he was binding the rental partnership when he signed the Agreement. Vander Plaats did not have actual authority–either express or implied–to enter into contracts on behalf of the partnership. See Tullis, 570 N.W.2d at 313-14 (reinstating summary judgment for corporation where the plaintiff failed to offer any evidence that the corporation's executive director was given either express or implied authority by the corporation to receive service of process on behalf of the corporation despite fact that the executive director identified himself as such to the process server).

Apparent authority, on the other hand, is based on a third party's reasonable belief that the agent has the authority to bind the principal. See Restatement (Third) of Agency § 2.03 (2006). The third party's belief "must be founded on the principal's actions, not those of the agent, since no agent by his own act can create evidence of authority." Lyman Lumber Co. v. Three Rivers Co., 400 N.W.2d 811, 814 (Minn. Ct. App. 1987) (internal marks omitted). Not only must the Trustees establish an affirmative course of conduct by the partnership of holding out Vander Plaats as its agent, but the Trustees must also establish that they relied on the partnership's implied grant of authority at the time Vander Plaats allegedly entered into the Agreement on behalf of the partnership. See Truck Crane Serv. Co. v. Barr-Nelson, Inc., 329 N.W.2d 824, 826-27 (Minn. 1983) ("Apparent authority exists only as to those third persons who learn of the manifestation from words or conduct for which the principal is responsible." (internal marks omitted)). There is no evidence that the Trustees even knew of the existence of the partnership in 1988, let alone that they believed, based on the partnership's actions, that Vander Plaats was authorized to bind the partnership. See id. (holding that even though individual's name appeared on corporate checks as secretary-treasurer, plaintiff's lack of awareness of that fact precluded it from relying on that fact to establish individual's apparent authority to bind corporation); Kenneally v. First Nat'l Bank of Anoka, 400 F.2d 838, 842 (8th Cir. 1968) ("[O]nly those who

have acted in reliance upon the apparent authority of the agent are entitled to recover where the agent possessed no actual authority."), cert. denied, 393 U.S. 1063 (1969). The district court properly concluded that the Trustees failed, as a matter of law, to establish that Vander Plaats acted as an agent for the rental partnership when he signed the Agreement on behalf of Nordic Press.

## 2. Alter Ego

We also reject the Trustees' attempt to use the alter ego doctrine to hold the rental partnership liable for Nordic Press's contractual obligations under the Agreement.[2] "[T]he alter ego doctrine as developed under corporate law provides that the legal fiction of the separate corporate entity may be rejected in the case of a corporation that (1) is controlled by another to the extent that it has independent existence in form only and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." Superior Gen. Contractors, 104 F.3d at

---

[2]We reject the Trustees' reliance on cases applying the labor law standard of the alter ego doctrine, which "involves a more lenient standard for disregarding the corporate form than that employed in corporate law." Superior Gen. Contractors, 104 F.3d at 1055 (rejecting labor law cases in an ERISA § 515 case). In any event, the Trustees' argument also fails under that more lenient standard, which is generally appropriate only when an employer reconstructs its business into another business in an effort to avoid its union obligations. See Trafford Distribution Ctr. v. N.L.R.B., 478 F.3d 172, 182 (3d Cir. 2007) (holding a start up company liable for its predecessor's union obligations), cert. denied, 128 S. Ct. 110 (2007); Flynn v. R.C. Tile, 353 F.3d 953, 959 (D.C. Cir. 2004) (holding a subsequent business that took over a CBA signatory's tile business liable under the CBA where the subsequent business was owned and operated by the same family out of the same location and completed the signatory's subcontracts); Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp., 139 F.3d 304, 307 (1st Cir. 1998) ("The alter ego doctrine is meant to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making a mere technical change in the structure or identity of the employing entity without any substantial change in its ownership or management." (internal marks omitted)).

1055. The rental partnership existed independently from Nordic Press. Bjorkedal and Jacobson as partners owned two buildings that were leased to Nordic Press in addition to the other Nordic companies. Bjorkedal and Jacobson reported the income and expenses from the partnership on their individual tax returns using Schedule E for rental income, whereas Nordic Press filed its own corporate tax returns. There was nothing fraudulent about Bjorkedal and Jacobson owning the buildings individually and leasing them to their wholly-owned corporations. As a corporate matter, this is a common practice, considered wise from a business perspective. Cf. Alson R. Martin & Michael D. Carson, Choice of Business Entity: Business, Tax, and Other Non-fringe Benefit Considerations, ALI-ABA Course of Study, SE66 ALI-ABA 525, 549 (Feb. 17, 2000) (noting parenthetically that "a building (. . . if owned, should almost always be owned in a separate partnership or limited liability company)"). The assertion that the rental partnership was the alter ego of Nordic Press lacks any merit.

### 3. Joint Venture

The Trustees' attempt to use the joint venture concept fares no better. "[A] joint venture . . . generally arises when necessary to impute negligence between two entities that otherwise have no legal relationship." Stelling v. Hanson Silo Co., 563 N.W.2d 286, 290-91 (Minn. Ct. App. 1997) (finding no joint venture between a corporation and its shareholder because they already had a legal relationship). Further, "[a] joint venture exists when two or more persons combine their money, property, time, or skills in a business enterprise and agree to share the resulting profits." Duxbury v. Spex Feeds, Inc., 681 N.W.2d 380, 390 (Minn. Ct. App. 2004). Here, a legal relationship already existed between Nordic Press and the partnership, that of a landlord and tenant pursuant to the leasing agreement. Further, the partnership was entitled to a set lease payment and was not entitled to share in any profits of an alleged enterprise with Nordic Press. See id. ("If the amount that one party receives is fixed, regardless of the success or failure of the enterprise, there is no joint venture."). There was no joint venture between Nordic Press and the partnership.

-11-

## 4. Ratification

Finally, the Trustees assert that the rental partnership is liable under the Agreement because it ratified Nordic Press's actions of signing the Agreement on behalf of the partnership as a controlled entity. "Ratification occurs when a person with 'full knowledge of all the material facts, confirms, approves, or sanctions, by affirmative act or acquiescence, the originally unauthorized act of another.'" Wells Fargo Home Mortgage, Inc. v. Chojnacki, 668 N.W.2d 1, 5 (Minn. Ct. App. 2003) (quoting Anderson v. First Nat'l Bank of Pine City, 228 N.W.2d 257, 259 (Minn. 1975)). "Conversely, ratification cannot occur when the principal does not have full knowledge of all material facts, unless constructive knowledge is imputed by the principal's acceptance of a transaction's benefits." Gresser v. Hotzler, 604 N.W.2d 379, 385 (Minn. Ct. App. 2000); see also Anderson, 228 N.W.2d at 259 (noting that lack of knowledge defeats a claim of ratification).

First, as already noted, Vander Plaats did not sign on behalf of the rental partnership. Second, there is no evidence that the rental partnership–acting through either Bjorkedal or Jacobson as its partners–confirmed, approved, or sanctioned Vander Plaats' alleged act of signing the Agreement on behalf of the partnership as a controlled entity with Nordic Press. Third, there is no evidence that Bjorkedal or Jacobson had "full knowledge" that Vander Plaats signed the Agreement on behalf of the partnership and that his signature could bind the rental partnership as an employer responsible for Nordic Press's contributions to the Fund. Finally, there can be no constructive knowledge because the rental partnership did not benefit from the Agreement. Nordic Press certainly benefitted by reducing its contributions to the Fund. But any indirect benefit to the partnership from its tenant's choosing to continue to make lease payments to the partnership (as the landlord), instead of paying its health benefit contributions, is not the type of direct benefit contemplated by the concept of ratification. Cf. Gresser, 604 N.W.2d at 385 (holding that acceptance of

-12-

earnest money was not a benefit from a sales contract containing modified terms unknown to the seller).

## B.  Piercing the Corporate Veil

In addition to the Trustees' claim that the Bjorkedals, as owners of the rental partnership, are the "employer" under the Agreement for purposes of ERISA § 515, the Trustees also seek to hold Olaf Bjorkedal, as the primary shareholder of P&P, personally liable under the separate common law doctrine of piercing the corporate veil.[3]  The primary benefit, and often the primary purpose, of incorporating a closely-held business is to shield the shareholders from liability for the corporation's debts.  See Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. 1979) ("Doing business in a corporate form in order to limit individual liability is not wrong; it is, in fact, one purpose for incorporating.").  In certain circumstances, however, it is appropriate to hold the shareholders liable for the corporation's liabilities, see Urban ex rel. Urban v. Am. Legion Post 184, 695 N.W.2d 153, 161 (Minn. Ct. App. 2005) ("Generally, a [shareholder] cannot be held liable for the wrongdoing of a [corporation] without a showing of improper conduct, fraud, or bad faith."), aff'd on other grounds, 723 N.W.2d 1 (Minn. 2006), and Minnesota courts apply a two-part test when considering whether to pierce the corporate veil to reach the shareholders.  The first part involves determining whether the corporation (P&P) is the alter ego or a mere instrumentality of the shareholder (Bjorkedal).  In making this determination, "a number of" factors must exist before a shareholder will be held liable for the obligations of a corporation: "(1) insufficient capitalization, (2) failure

---

[3]The Trustees raise a common law alter ego theory separate from their use of that theory in their attempt to hold the rental partnership to the Adoption Agreement as a controlled entity with Nordic Press.  They admit, however, that this alternate alter ego theory, which attempts to treat the rental partnership as the alter ego of Nordic Press and its successor P&P,  "mirrors" the one we have already rejected (Appellants' Br. at 51), and we need not address it again.

to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of debtor corporation, (5) siphoning of funds, (6) nonfunctioning of officers and directors, (7) absence of corporate records, or (8) existence of corporation as a mere [] facade for individual dealings." Id. The second part of the test "requires a finding of injustice or fundamental unfairness." Id. at 162. The Trustees must establish a genuine issue of material fact concerning both parts of the test to avoid summary judgment. Id.

We agree with the district court that this is not the appropriate case to pierce the corporate veil to reach the individual shareholder. The undisputed facts demonstrate that Bjorkedal did not treat P&P as an extension of himself; rather, P&P was treated separate and distinct from Bjorkedal's personal interests. P&P was the result of consolidating three corporate entities that had been in business for nearly 40 years. Bjorkedal did not siphon off funds, but rather made large cash infusions to try to save the corporation long after the CFO thought it wise to do so. That corporate formalities may not have been scrupulously followed does not change the fact that Bjorkedal treated P&P as its own business. We need not reiterate the district court's thorough discussion of the factors. Suffice it to say that P&P was neither the alter ego nor a mere instrumentality of Olaf Bjorkedal.

We also agree that there is no element of injustice or unfairness in recognizing P&P's separate corporate existence. The fact that P&P continued to make payments on its building lease rather than make its contributions to the Trustees does not rise to the level of unfairness or injustice required to pierce the corporate veil. See Ass'n of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc. 553 N.W.2d 446, 450 (Minn. Ct. App. 1996) (reversing district court's finding that corporate veil should be pierced based on the fact that subsidiary paid down loan guaranteed by the parent corporation rather than pay trade creditors, thereby benefitting parent to the detriment of creditors, because decision to pay secured creditor, although beneficial to parent corporation, was based on legal obligations and was not the type of inherent unfairness needed to

-14-

support piercing the corporate veil). With limited cash and an inability to pay all of its creditors, it was within P&P's management's discretion to choose to pay its lease obligations and stave off an eviction from its premises in an attempt to continue its operations instead of paying benefit contributions for its employees. The Trustees have failed to provide any evidence to support a finding of injustice or fundamental unfairness, and the district court's grant of summary judgment on the corporate veil piercing theory is affirmed.

## C. Fiduciary Liability

The Trustees finally attempt to hold Olaf Bjorkedal liable for the delinquent premiums as a plan fiduciary. Bjorkedal was not a named fiduciary under the plan. Nonetheless, an individual is subject to fiduciary duties under ERISA "to the extent he exercises any discretionary authority or discretionary control respecting management of such plan or . . . management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). Subsection (i) imposes a fiduciary duty on those who exercise discretionary authority, "regardless of whether such authority was ever granted." Olson v. E.F. Hutton & Co., 957 F.2d 622, 625 (8th Cir. 1992). The Trustees argue that Bjorkedal exercised discretionary authority concerning the disposition of plan assets when he failed to ensure that both the employees' premiums withheld from their paychecks and the employer's share of the premiums were paid to the Fund.

The fiduciary status applies, however, only when the individual is performing a fiduciary duty; it "is not an all-or-nothing concept." Darcangelo v. Verizon Communications, Inc., 292 F.3d 181, 192 (4th Cir. 2002) (internal marks omitted). Persons who serve as fiduciaries may also act in other capacities, even capacities that conflict with the individual's fiduciary duties. What "ERISA requires[, is,] 'that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions.'" Holdeman v. Devine, 474 F.3d 770, 780 (10th Cir. 2007) (quoting Pegram v. Herdrich, 530 U.S. 211, 225 (2000)). "In every case

-15-

charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." Pegram, 530 U.S. at 226.

Corporate assets do not become plan assets merely because an employer has a corporate obligation to make payments to the plan. A corporate officer facing limited cashflow who chooses to pay corporate obligations in lieu of employer contributions to an ERISA plan does not breach a fiduciary duty when he makes those decisions wearing his corporate officer hat rather than his fiduciary duty hat. See Holdeman, 474 F.3d at 780 ("[W]hen Devine was deciding whether to allocate State Line funds to the Plan or [to owner distributions and charitable contributions], it is clear that he was acting in his capacity as CEO of State Line, and not in his capacity as a plan fiduciary."). See also In re Luna, 406 F.3d 1192, 1203 (10th Cir. 2005) (holding that an employer that fails to make plan contributions violates a contractual duty, not a fiduciary duty, because a contractual obligation to fund a plan is not a discretionary decision regarding management or disposition of plan assets); Local Union 2134, United Mine Workers of Am. v. Powhatan Fuel, Inc., 828 F.2d 710, 714 (11th Cir. 1987) ("[T]his decision by [the president] to pay bills other than the insurance premiums was not made in his capacity as fiduciary of the health plan, it was made as the president of the corporation. Indeed, until monies were paid by the corporation to the plan there were no assets in the plan under the provisions of ERISA."). Thus, to the extent P&P failed to remit its share of the benefit premiums, the decision to pay P&P's other obligations rather than the Fund premiums was a corporate decision, not a fiduciary decision concerning plan assets.

This still leaves the issue of the $6,440 delinquent obligation owed for the employees' share of the health benefit premiums. Although those funds were Fund assets once they were withheld from the employees' paychecks, see In re Luna, 406

F.3d at 1206 n.13 (distinguishing between employer-owed contributions, which are not plan assets, and employee paycheck withholdings, which are plan assets); Phelps v. C.T. Enters., Inc., 394 F.3d 213, 219 (4th Cir. 2005) ("Where . . . an employer is entrusted with employee funds for remittance to a claims administrator . . . the employer is acting in a fiduciary capacity under ERISA."), ERISA imposes a fiduciary duty under subsection (i) only "to the extent [the fiduciary] exercises any discretionary authority," § 1002(21)(A)(i). As noted, subsection (i) imposes fiduciary obligations on individuals who are not named as fiduciaries but nonetheless exercise actual authority over plan assets. Because this subsection imposes a fiduciary duty on those not named as a fiduciary, its reach is limited to circumstances where the individual actually exercises some authority. Here, the only evidence in the record is that Bjorkedal was not personally involved in the decision not to remit the employee withholdings to the Fund, or for that matter, any of the decisions regarding which creditors got paid and which did not (including P&P's share of the premiums). In fact, Bjorkedal testified that he specifically asked Foster if they were paid up with the union at the time P&P filed for bankruptcy protection. The Trustees implicitly acknowledge the adverse record by arguing that by omission Bjorkedal failed to ensure that the employee withholdings reached the Fund. (Appellants' Br. at 61.) Their argument proves too much. An act of omission fails to satisfy the requirement that the individual *exercise* discretionary authority over plan assets. See § 1002(21)(A)(i). There is no evidence that Bjorkedal exercised any authority over the employees' withholdings. He was not involved in any of P&P's financial decisions; rather, the only evidence in the record reveals that Foster handled all financial matters, informing Bjorkedal only when cashflow was insufficient to make payroll. The district court appropriately granted summary judgment to Bjorkedal on the breach of fiduciary duty claim.

Because we affirm the district court's grant of summary judgment to the Bjorkedals, we need not address the Trustees' alternative arguments that they are entitled to summary judgment.

## III.

The district court declined to award attorney's fees to the Bjorkedals under 29 U.S.C. § 1132(g)(1), which gives the district court discretion to award attorney's fees and costs to either party. We have previously recognized that "[a] district court considering a motion for attorney's fees under ERISA should . . . apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts." Starr v. Metro Sys., Inc., 461 F.3d 1036, 1040 (8th Cir. 2006) (internal marks omitted). We consider five factors in determining whether a district court abused its discretion concerning a fee award, including: (1) the opposing party's culpability or bad faith, (2) the opposing party's ability to pay an award of attorney's fees, (3) the deterrent value an attorney's fee award might have on other persons acting under similar circumstances, (4) whether the requesting party sought to benefit all of the participants and beneficiaries of an ERISA plan or sought to resolve a significant legal question related to ERISA, and (5) the relative merits of both parties' positions. Leonard v. Sw. Bell Corp. Disability Income Plan, 408 F.3d 528, 532 (8th Cir. 2005). We agree with the district court that the Trustees, acting as fiduciaries for the Fund, brought the action to protect the Fund and did not act in bad faith. The district court did not abuse its discretion in refusing to award attorney's fees to the Bjorkedals for their successful defense of this ERISA action.

## IV.

The district court's judgment granting summary judgment to the Bjorkedals and its judgment denying the Bjorkedals' request for attorney's fees are affirmed.

_____