# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2283

_____

| | | |
|---|---|---|
| Carpenters District Council | * | |
| of Kansas City Pension Fund; | * | |
| Terry L. Davis, Trustee of the | * | |
| Carpenters District Council of | * | |
| Kansas City Pension Fund and the | * | |
| Kansas City and Vicinity Welfare | * | |
| Fund; Jeffrey Chaikin, Trustee of | * | |
| the Carpenters District Council of | * | |
| Kansas City Pension Fund and the | * | |
| Kansas City and Vicinity Welfare | * | |
| Fund; Carpenters District Council | * | |
| of Kansas City and Vicinity Welfare | * | |
| Fund, A Trust Fund; Carpenters | * | |
| District Council of Kansas City and | * | |
| Vicinity Apprenticeship and Training | * | Appeal from the United States |
| Fund, A Trust Fund; Joseph E. Pink, | * | District Court for the Western |
| Trustee of the Carpenters District | * | District of Missouri. |
| Council of Kansas City and Vicinity | * | |
| Apprenticeship and Training Fund, | * | |
| | * | |
| Appellees, | * | |
| | * | |
| v. | * | |
| | * | |
| JNL Construction Co., Inc,; Larry | * | |
| K. McAllister; Nancy E. McAllister; | * | |
| TVM Rentals, LLC, | * | |
| | * | |
| Appellants. | * | |
| | * | |

_____

Submitted: January 12, 2010
Filed: February 25, 2010
_____

Before MURPHY and BYE, Circuit Judges, and STROM,[1] District Judge.
_____

BYE, Circuit Judge.

JNL Construction Company, Inc. (JNL), Larry McAllister (Larry), Nancy McAllister (Nancy), and TVM Rentals, Inc. (TVM) appeal the district court's adverse grant of summary judgment in an action brought under section 502, see 29 U.S.C. § 1132 (civil enforcement), and section 515, see 29 U.S.C. § 1145 (delinquent contributions), of the Employment Retirement Security Income Act (ERISA). Upon de novo review, see Trs. of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal, 516 F.3d 719, 725 (8th Cir. 2008), we reverse and remand for further proceedings.

I

Trustees for the Carpenters District Council of Kansas City Pension Fund, Carpenters District Council of Kansas City and Vicinity Welfare Fund, and Carpenters District Council of Kansas City and Vicinity Apprenticeship and Training Fund (collectively the Funds) brought an ERISA action on behalf of the Funds against JNL, the McAllisters, and TVM. The Funds alleged defendants failed to contribute union employees' fringe benefits to the Funds from November 2003 through January 2005, as required by collective bargaining agreements covering carpenters who performed

_____

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

work for JNL.[2]  The Funds sought to pierce the corporate veil of JNL to reach the McAllisters and TVM.  The relevant summary judgment record--which included Larry's and Nancy's deposition testimony and declarations, as well as bank and mortgage records--reveals the following.[3]

JNL was in the business of finish-carpentry and employed only carpenters.  The collective bargaining agreements were entered into in 1995 before JNL was incorporated in 1998 (the year the McAllisters divorced); at various times Larry and Nancy each owned from 49-51% of JNL.  JNL had an office manager, and Nancy's son served as JNL's secretary/treasurer and chief executive officer at times, so Nancy was not always aware of JNL's income and expenses.  Larry primarily worked as a carpenter, superintendent, or job bidder, leaving JNL's financial matters to others.  JNL began having cash flow problems in 2003, and Larry drew no salary from late 2003 to late 2004.  Around October 2004, Nancy became JNL's sole owner and president.  According to Nancy, the JNL stock had little or no value at the time, so she paid Larry nothing; she explained the transfer occurred because Larry could not get his pension as a union carpenter if he retained any interest in JNL.  Nancy also testified JNL ceased operations in August 2005.  Its checking-account statements from July 2004 to January 2005 reflect multiple deposits and checks; the lowest monthly balance was $20,408 and the highest was $128,392.

JNL operated out of various locations.  Larry personally paid either the rent or the mortgage payments for these locations, in part because the locations usually also served as his residence, and in part because his tax advisor so recommended; he was

[2]During oral argument appellees indicated there were some contributions made during this period, although this issue appeared undisputed in the district court.

[3]We summarize our findings as to what the record showed, because some of the evidence upon which the Funds relied was not helpful, e.g., the checking-account statements did not reflect the source of the deposits or to whom checks were written, and some deposition excerpts were taken out of context.

only sporadically reimbursed by JNL. JNL was last located in a residence in Pleasant Hill, Missouri. JNL took out a construction loan of around $250,000 to build the residence, but Larry put $60,000 of his own money into the project; Larry understood whoever resided in the residence upon its completion (which at first was Nancy's son) would pay off the construction loan. In July 2004, Larry took out a personal mortgage of $462,000 on the residence and netted $217,740 after paying off the existing mortgage. He deposited the proceeds into his personal account. He declared he used the money for JNL's business expenses, offering copies of personal checks totaling $95,000 which he wrote to JNL in July, August, and September 2004, and a copy of a $100,000 check he wrote to the Internal Revenue Service in August 2004 to satisfy JNL's tax liability.[4] A few days after Larry obtained the July 2004 loan, he bought the Pleasant Hill residence from JNL. The warranty deed recited the consideration was $10 and "other valuable consideration"; according to Larry, in addition to the payment of $10, he had agreed to satisfy the debt on the residence. From November 2004 to July 2005, Larry and Nancy lived at the residence, where JNL also conducted business beginning in either July or November 2004. Meanwhile, in December 2004 Larry took out another personal mortgage on the Pleasant Hill residence for $588,000, and this time netted about $86,000 after satisfying the existing mortgage. He placed these proceeds in JNL's account a few days later. In June 2005 Larry sold the residence for $800,000, and realized a profit of about $184,000. However, court records show all but around $49,000 was owed to a lender.

In August 2004, JNL transferred its tools to TVM for $100,000, but money was never exchanged. TVM rented the tools back to JNL, but because of cash-flow problems, no rental payments were made. The tools were sold in July 2005 for a profit of only around $19,700. Checking-account statements for TVM from 2004 and

---

[4]At oral argument appellants suggested there were two $100,000 payments to the Internal Revenue Service on JNL's behalf, but the summary judgment record reflected only one.

2005 reflect at most a balance of around $2,000; as of November 2004, these statements were sent to the Pleasant Hill residence. JNL was TVM's sole customer.[5]

In granting summary judgment to the Funds, the district court interpreted the complaint as raising claims only under ERISA, and applied this court's holding in Greater Kansas City Laborers Pension Fund v. Superior Gen. Contractors, Inc., 104 F.3d 1050 (8th Cir. 1997): to pierce a corporate veil, a court must consider (1) whether a corporation was controlled by another to the extent it had independence in form only, and (2) whether the corporation was used as a subterfuge to defeat public convenience, justify wrong, or perpetrate a fraud. Id. at 1055. The district court pointed to the following transactions cited by the Funds in concluding the first prong of the Greater Kansas City Laborers test had been met: the McAllisters shared space with JNL, and paid for the space; Nancy acquired the JNL stock for no value; JNL obtained a $250,000 construction loan to build the Pleasant Hill residence, and then Larry took out personal mortgages on it and received the net loan proceeds; Larry bought the Pleasant Hill residence, and his affidavit was insufficient to contradict the warranty deed's recitation indicating he paid only $10; Larry paid JNL's $100,000 tax debt; and JNL sold tools to TVM for $100,000, without receiving payment, and then failed to pay for renting the tools from TVM. The court also concluded defendants engaged in conduct to perpetrate a fraud to avoid paying JNL's creditors, noting Larry had repeatedly deposited money into JNL's account, but payments to the Funds were never made.

On appeal, the McAllisters, JNL, and TVM essentially reiterate their arguments from below, contending the Funds failed to establish a causal connection between the transactions upon which they relied and JNL's insolvency or undercapitalization.

---

[5]The record is unclear as to when TVM was formed, and there was no evidence as to why it was formed or who owned or controlled it, as to the tools' value when they were essentially given to JNL in 2004, or as to who financially benefitted from the July 2005 sale of the tools.

In Greater Kansas City Laborers, plaintiffs (Missouri employee trust funds) sued solely under ERISA sections 502 and 515 to recover unpaid contributions from a corporate entity, and this court relied on the two-part test cited above in conducting its alter-ego analysis. See id. at 1052-55 (corporate-law standard for determining alter-ego status strikes appropriate balance between congressional intent of ERISA and long-established principle that corporation's existence is presumed to be separate and may be disregarded only in narrowly prescribed circumstances). In another section 515 case, this court cited the Tenth Circuit's federal common-law standard for piercing the corporate veil between a corporation and an individual, noting this court had previously concluded corporate officers could not be held personally liable under ERISA without a basis for piercing the corporate veil. See Minn. Laborers Health & Welfare Fund v. Scanlan, 360 F.3d 925, 927-29 (8th Cir. 2004) (citing Tenth Circuit's two-prong test: (1) whether there was unity of interest and lack of respect given to separate identity of corporation by its shareholders, so personalities and assets of corporation and individuals are indistinct, and (2) whether adherence to such corporate fiction sanctions fraud, promotes injustice, or leads to evasion of legal obligations).[6]

---

[6]As they did below, appellants argue the district court should have applied the three-part test Missouri courts use for determining whether corporate owners should be held personally liable for corporate debts: (1) control, not mere majority or stock control, but complete domination, not only of finances, but of policy and business practice concerning the transaction, such that the corporate entity had no separate existence; (2) breach of duty--where such control was used to commit wrong or fraud, to perpetrate the violation of a statutory or other legal duty, or to commit an unjust or dishonest act in contravention of the plaintiff's rights; and (3) the control and breach of duty proximately caused the plaintiff's injury. See Mobius Mgmt. Sys., Inc., v. W. Physician Search, LLC, 175 S.W. 3d 186, 188-89 (Mo. Ct. App. 2005); see also Collet v. Am. Nat'l Stores, Inc., 708 S.W. 2d 273, 283-87 (Mo. Ct. App. 1986) (applying tripartite test to determine whether one corporation was liable for debts of another corporation). The district court acknowledged the Missouri tripartite test and found

## III

As to the McAllisters, we conclude the evidence of commingling of funds established as a matter of law the first part of either test. Specifically, a jury could only conclude JNL was so controlled by the McAllisters it had independence in form only, or there was a unity of interest and lack of respect given to the separate identities of JNL and the McAllisters so the personalities and assets of JNL and the McAllisters were indistinct. However, we find the Funds did not produce sufficient evidence to show the absence of trialworthy issues on the second prong: whether JNL was used as a subterfuge to defeat public convenience, justify wrong, or perpetrate a fraud; or whether adherence to the corporate fiction sanctioned fraud, promoted injustice, or resulted in an evasion of legal obligations. The district court, as well as the Funds, gave little explanation as to why the same transactions the Funds cited as establishing the first prong of the test in Greater Kansas City Laborers also met the second prong. We fail to see how the Funds' evidence definitively established JNL was used by the McAllisters to avoid paying the contributions at issue, and the Funds identified no other way in which JNL was used to justify wrong, commit fraud, or promote injustice. To the contrary, it appears JNL, and thus its creditors, benefitted from Larry's payments toward the premises where JNL conducted business, his payment of JNL's taxes, his deposits of refinancing proceeds into JNL's account, and his decision not to draw a salary for a year. Cf. Trs. of the Graphic Commc'ns Int'l Union, 516 F.3d at 729 (finding nothing fraudulent about corporate officers leasing buildings they personally owned to their wholly owned corporation).

---

it similar, and in any event, our conclusions as to the grant of summary judgment do not change if the Missouri tripartite test is applied.

IV

Similarly, as to TVM's liability, we conclude the first prong of the test in Greater Kansas City Laborers--whether JNL so controlled TVM, the two entities were independent in form only--was met because JNL was TVM's sole customer, TVM never paid the $100,000 for the purported purchase of JNL's tools, and JNL did not thereafter pay TVM for tool rentals. See Greater Kansas City Laborers, 104 F.3d at 1055 (equity will set aside transaction when it does not carry earmarks of arm's length bargain). However, as with the McAllisters, given the paucity of evidence in the record concerning TVM, and the lack of explanation on the second prong of the test-- whether TVM was used as a subterfuge to defeat public convenience, justify wrong, or perpetrate a fraud--we also find trialworthy issues on this prong as to TVM.

V

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

_____